SARA L. CAPLAN, CSB#147271
Attorney at Law
3550 Wilshire Blvd., #1130
Los Angeles, Ca. 90010
(310) 550-5877
Email: saralcaplan@gmail.com

CHRISTOPHER R. BLACK, WSBA#31744
Black & Askerov, PLLC
705 Second Ave., #1111
Seattle, WA. 98104
(206) 623-1604
Email: chris@blacklawseattle.com

Attorneys for Defendant,
Ryan S. Hernandez

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RYAN S. HERNANDEZ,<br><br>Defendant, | Case No.: 2:19-CR-00259-JCC-1<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**<br><br>Date:  December 1, 2020<br>Time: 9:00 a.m.<br>Place: Courtroom 16206<br><br>**Honorable John C. Coughenour** |

//

// //

// // //

## **TABLE OF CONTENTS**

I.    OPENINIG COMMENTS …………….....…………………………….4

II.   SUMMARY OF DEFENDANT'S SENTENCING MEMORANDUM…..5
      A. Procedural Posture………...………....………………………..…6
      B.  Summary of the Argument……………………………………7

III.  THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
      PURSUANT TO 18 U.S.C. § 3553 (a)(1)……...……………...,…....11
      -Familial History and the Early Years…….…….……………...…11
      -The Formative Years…………………….……………….................14
      -Ryan Hernandez and His Personal Struggles Today…..………......15
      -Overview of Gaming Addiction……………………………...…17
      -Autism and the Criminal Justice System..………………………19
      -Ryan is Vulnerable to Victimization or Abuse in Prison…..……...22

IV.   FACTS OF THE CASE AND PROCEDURAL BACKGROUND...……23

V.    THE SENTENCING GUIDELINES IN THIS CASE LACK THE
      SUPPORT OF EMPERICAL  EVIDENCE……………………………...24

VI.   THE STATUTORY SENTENCING FACTORS IN 18 U.S.C.§3553(a)
      REQUIRE A SENTENCE BELOW THE GUIDELINES RANGE……..25
      A. The Nature and Circumstances of the Offense 18 U.S.C.§3553(a)(1)..27
      B. The Purposes of Sentencing 18 U.S.C. § 3553(a)(2)……………….. 29

      1.The Seriousness of the Offense and Promoting Respect for the Law,
      and Just Punishment-18 U.S.C. 3553(a)(2)(A)...………………...........30

      Mr. Hernandez' mental health and the risks of COVID-19 in custody
      makes incarceration at BOP an unrealistic placement for the
      defendant……………………………………………………….31
       2. Deterrence-18 U.S.C. § 3553(a)(2)(B)……………………………33
       3. The Need to Protect Society-18 U.S.C. § 3553(a)(2)(B)……...…..35
       4. The Most Effective Sentence-18 U.S.C. § 3553(a)(2)(D)……...…36

VII.  CONCLUSION……...……………………………………………36

VIII. LIST OF EXHIBITS……………………………………………….....39

# Table of Authorities

## CASES                                                                 Page(s)

Pepper v. United States, 131 S. Ct. 1229, 1239, 1240 (2011)……….…..…......5,22

United States v. Booker, 125 S. Ct. 738, (2005)……………………….…..….7,21

Gall v. United States, 128 S.Ct. 586, 591 (2007)……………………....7,22,25,34

United States v. Grober, 624 F.3d 592 (3rd Cir.2010)………………………7,21

United States v. Parish, 308 F.3d 1025, 1031 (9th Cir. 2002)……………..……18

Koon v. United States, 518 U.S. 81, 116 S. Ct. 2035, (1996)……….….……..18

United Sates v. Rita, 551 U.S. 338, 349 (2007)………………...…..…..…….…..20

Kimbrough v. United States, 128 S. Ct. at 570 (2007)…………………...21,22

Nelson v. United States, 129 S.Ct. 890,891 (2009)………………...…….…....22

United States v. Baird, 580 F. Supp. 2d 889 (D.Neb 2008)……………………24

United States v. Olhovsky, 562 F.3d 530, 551-52 (3rd Cir. 2009)………...….24,25

United States v. Lopez, 938 F2d 1293, 127-99 (D.C. Cir 1991)……...……..26

United States v. Walter, 256 F. 3d 891 (9th Cir.2001)…………..…….….…..27

United States v. Rivera, 192 F 3d 81, 84 (2nd Cir 1999)…………..….………27

United States v. Beiermann, 599 F.Supp. 2d 1087 (N.D. Iowa 2009)………….30

# I.
## OPENING COMMENTS

Defendant Ryan S. Hernandez, by and through his attorneys of record, Sara L. Caplan and Christopher R. Black, hereby submits his Sentencing Memorandum,[1] setting forth the factors the Court should consider in determining what type of sentence is sufficient, but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

Mr. Ryan Hernandez has had significant time to reflect on his actions and criminal conduct in this matter and is regretful over the anguish it has caused to the victims and the Government. Mr. Hernandez submits to this Court as a challenged young man who is deeply remorseful and demonstratively affected by the pain, suffering, and humiliation he has caused his loved ones who care for him deeply.

At the heart of this case is the fact that Mr. Hernandez has made grave mistakes, that today jeopardize his freedom. However, his actions which were initiated as a 16-year old minor and most likely aggravated by his Autism Spectrum Disorder, illustrate that few legal principles are as deeply entrenched in

---

[1] Mr. Roger Pimentel, a sentencing consultant, assisted in the investigation and preparation of this filing. Mr. Pimentel's Curriculum Vitae is attached as Exhibit F.

our present jurisprudence as the concept of individualized sentencing. As the Supreme Court has observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.
> *Pepper v. United States, 131 S. Ct. 1229, 1239, 1240 (2011).*

Thus, in each case a sentence should reflect an individualized assessment of a particular offender's culpability and potential success in the community rather than a mechanical application of a given sentence to a particular category of crime.

## II.
## SUMMARY OF DEFENDANT'S SENTENCING MEMORANDUM

Mr. Hernandez is prepared to accept the sentence the Court finds appropriate pursuant to the plea agreement he agreed to in this case. Mr. Hernandez understands that accepting responsibility for his conduct may include a significant period of incarceration in federal custody. Mr. Hernandez, through his lawyer, moves the court to vary from the calculated guideline range of 63 to 78 months, and impose a "reasonable, fair, and just punishment" of no more than 36 months as agreed upon in the plea agreement, with an appropriate term of

supervised release, which is more than sufficient to meet the purposes of 18 U.S.C. §3553(a)(2).

## A. Procedural Posture

1.  Mr. Hernandez is charged by Superseding Information with two counts – Count 1: *Computer Fraud and Abuse,* a violation of 18 U.S.C. §1030(a)(2)(C) and (c)(2)(B)(iii); Count 2*: Possession of Child Pornography,* a violation of 18 U.S.C. §2252A(a)(4)(b) and (b)(2).

Beginning in at least 2016,[2] and continuing through June of 2019, Mr. Hernandez hacked into protected computers of Nintendo and stole non-public and proprietary data belonging to Nintendo and shared the data with others through social media and online portals. In late 2016 and early 2017, when Ryan was 16 years old, the Federal Bureau of Investigation (FBI) contacted Mr. Hernandez and his parents. Mr. Hernandez agreed to cease his conduct. Mr. Hernandez continued his conduct and executed additional intrusions of Nintendo servers. Case agents eventually returned with search warrants. In addition to evidence of continued hacking, agents located sexually explicit images of minors determined to be illegal.

2.  Pursuant to a written plea agreement Mr. Hernandez entered a plea of guilty to both counts. In exchange, the Government has agreed to recommend a

---

[2] The defense notes that Mr. Hernandez was a minor and age 16, when his criminal conduct was initially investigated by the Government.

three level reduction for acceptance of responsibility and timeliness of guilty plea (PSIR at ¶ 45). The Government and Mr. Hernandez both agree to recommend a concurrent sentence of no more than 36 months, for the two counts. Count two is the controlling count in this matter.

3.   The Pre-Sentence Investigation Report (PSIR), pursuant to U.S.S.G. § 2G2.1 finds that the Total Offense Level is 26 and the Criminal History Category I (PSIR at ¶¶ 46,49). The resulting recommended Guideline range of imprisonment is 63 to 78 months.

4.   Mr. Hernandez moves the court to sentence him pursuant to the plea agreement and a "reasonable and just" sentence of not more than 36 months, followed by an appropriate period of supervised release.

## B. Summary of the Argument

5. The Guidelines are advisory. *United States v. Booker,* 125 S. Ct. 738, (2005)*, Gall v. United States*, 128 S.Ct. 586, 591 (2007). The properly calculated guideline range is not to be presumed reasonable by the district court. *Gall v. United States.* Recently, the child pornography guidelines, have been criticized and scrutinized as the product of Congressional mandates with no empirical support or distinction for differences between offenders. *United States v. Grober, 624 F.3d 592 (3rd Cir.2010)*; United States Sentencing Commission, REPORT

TO CONGRESS: CHILD PORNOGRAPHY OFFENSES (December 2012). This is contrary to the goals of sentencing expressed in 18 U.S.C. §3553.

6. Analysis of the facts of this case and application of §3553 factors favor a downward variance to a "reasonable and just" sentence followed by an appropriate term of supervised release. Further supporting this is the present global Coronavirus-19 pandemic which is impacting federal prison populations.[3]

7. Ryan Hernandez is a young man, who was aged 16 to 20 when his conduct occured. As a youthful man who has voluntarily pled guilty to seperate counts, one alleging "hacking" and computer abuse and an unrelated Child Pornography charge. The charges, as indicated in the plea agreement and statement of facts, involve Mr. Hernandez intruding on protected servers and stealing propriertary data belonging to Nintendo. Additionally, Mr. Hernandez was found in possession of sexually explicit images involving minors. Up until the present matter, Ryan Hernandez was a dependent, challenged young man, living with his parents. As an extremely autistic individual with selective mutism, Ryan struggles with common daily tasks such as hygiene and using the restroom. Additionally, his chaotic upbringing and loneliness contribute to a misguided and sad childhood. Further, Ryan's immaturity and age at the time of conduct bring into question his brain functioning and development of responsibility.  In

---

[3] https://www.bop.gov/coronavirus/covid19_status.jsp

reality, the nature of Ryan's developmental disabilities will probably never permit him to live an independent life. Ryan Hernandez, *a first time offender*, now faces a potential guideline sentence that could incarcerate him for years. He presently faces an advisory "low end" guideline range of 63 months in custody. Indisputably, the charges against him which include possession of child pornography are very serious offenses, as reflected by the potential penalties in such cases. However, as demonstrated below, on multiple levels, Ryan Hernandez deserves a mitigated sentence which will be sufficient to promote the goals of sentencing. Also, such a sentence is not greater than necessary given the atypical circumstances of the case and personal  characteristics of the defendant.

8.   The sexual exploitation and child pornography guidelines applied to Mr. Hernandez' case are unique to the extent that they have been so grossly increased in just recent years. As a result of the Protect Act and the Adam Walsh Act, the Guidelines added a greater base offense level; mandatory minimums and enhancements for various specific offense characteristics. As seen in the underlying matter, the effect of the enhancements on Ryan is to make his calculated guideline range exposure significantly more than it would have been in recent years past. With no empirical evidence to support how these increased guidelines support the purpose of sentencing, it suggests, at the very least, that political forces, rather than analytical analysis, have entered the fray as to what

constitutes "just punishment".

9.    Mr. Hernandez entered a timely guilty plea, as he recognizes his wrong-doing and wholeheartedly accepts responsibility for it, while being sincerely remorseful. Ryan should receive some rightful benefit of entering into a plea agreement with the Government at the earliest possible time.

10.  Based on Mr. Hernandez' lack of criminal history, his lifetime challenges with developmental abilities, correlating abysmal childhood, probable cyber addiction issues, and his *unconditional acceptance of responsibility*, a reasonable and just sentence of no more than 36 months is appropriate.

### III.
### THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
### *18 U.S.C. § 3553(a)(1)*

In order to understand why Ryan Hernandez has arrived at this federal sentencing, it is important and necessary to understand Mr. Hernandez's background and the life he has lived. Ryan Hernandez is developmentally disabled and a product of a turbulent and chaotic home, featuring uncertainty and ineffective parenting which forced Ryan into personal isolation and reliance on negative outside influences found on the dark corners of the internet.

An understanding of Ryan's family background and chronological history gives insight into his poor self-image and social development.

## Familial History and the Early Years

Ryan Stewart Hernandez was born in Palmdale, where he has lived his entire life, primarily in his bedroom, in his parents' home. Ryan is the youngest of four siblings born to the marital union of Ruben and Sheila Hernandez.

Ryan's father has worked his entire professional life in the hospitality industry. Today, he is employed as a general manager of a large hotel in Santa Monica. Prior to the COVID-19 pandemic, Ruben would work 12 to 16 hours daily in his upper management position. Today he is furloughed from his position but is hopeful of returning some time in 2021. Ryan's mother, Sheila, met Ruben in the early 1990's while also working in the hospitality business. The couple hit it off and married in 1993. Shelia would eventually leave the hospitality business, making Ruben the sole provider of the family. Sheila's focus throughout the marriage has been raising their four children and managing her medical conditions.

Ryan was born on January 24, 1999. Ruben and Sheila were well established in Palmdale, a growing suburb of Los Angeles. Ruben and Sheila had purchased a nice suburban home for the large family a few years earlier. Living in Palmdale meant long commutes for Ruben who would travel at least 60 miles one way. Aggravating the commute was traveling on the 405 freeway to West Los Angeles, which is notoriously known as the worst freeway in the country. It

is not uncommon for Ruben to commute between 4 to 6 hours on any given day. Sheila's life at home was busy. Shuffling and caring for four children was demanding. This was in addition to Sheila suffering from Lupus, a very serious autoimmune disease that attacks healthy tissue and may cause damage to internal organs.

While Ryan was the youngest, there was a 12 year difference between all the children. Sean, the oldest, was in his teenage years and by all accounts was a loving and caring child growing up. Unfortunately, during his latter teenage years Sean was introduced to narcotics and Sean has struggled with addiction ever since. Today, despite the familial efforts to help, Sean (age 33) continues to be homeless, drug addicted, and a repeat criminal offender. Today, Ruben and Sheila continue in family court proceedings on behalf of their 4 year old grandson, as Sean has been deemed an unsuitable parent by the family courts. Needless to say, all of the challenges related to Ryan's older brother has been exhausting and dramatic over the past years. Episodes of overdoses, parole agents visiting regularly, and law enforcement serving warrants was a common occurrence. It is in this backdrop, that Ryan and his older sisters were raised.

While living in Palmdale, Ryan attended the neighborhood preschool and elementary school. From the earliest days of Ryan's education, it was evident that his social skills were lacking. Ryan spoke sparingly with a significant lisp and

stutter in his early years. Additionally, Ryan never adapted to toilet training as a child. Years of effort, pull-up diapers, and incidents of urinating and defecating in his clothing frustrated his parents and also pointed to developmental challenges.[4] These physical attributes did not help Ryan with his peers, as classmates were relentless in their teasing and bullying. This contributed to Ryan's negative self-image, often thinking of himself as "stupid", despite being an average student. Ryan's physique was also heavy and made him an easy target for school bullies. The end result was that Ryan did not establish a lot of friendships in his early years. This in turn made him introverted and even a loner. Ryan found himself at home spending a lot of time trying to hide from the daily struggles of school and peer groups that surrounded him. Despite the bullying, and the significant lack of attention at home, Ryan found a way to progress in his academics.

**The Formative Years**

Ryan continued on to Hillview middle school with many of the same daily struggles. During his middle school years his Selective Mutism[5] [6] became more

---

[4] Starting in the 6th grade, Ryan started using a bucket to defecate in and would only urinate in the shower. He continues this practice today, as he is still not proficient in using the toilet.

[5] https://www.psychologytoday.com/us/conditions/selective-mutism

[6] Children with selective mutism often have a family history of anxiety disorders. The neurological basis for selective mutism is thought to be a cascade of events in an area of the brain known as the amygdala, which receives danger signals from the environment. The anxiety from a situation perceived as dangerous to the child's well-being causes a communication shutdown. Children with selective

prevalent. This is the time period in which Ryan was sent to multiple therapists, all of whom were unsuccessful in treating him, because they were unable to communicate with Ryan.  Ryan continued in school with very mixed results. In courses that interested him, such as science and information technology, he often did well.  Subject matters that did not interest him usually correlated with poor marks.

Ryan's middle school years is also the time period that he was introduced to computers. Ryan quickly found spending time on the internet as his alternative reality. Ryan was a loner. In order to pass time and fill the void of loneliness that Ryan often felt, he turned to the internet and video games. As his interest in video games grew into an unhealthy obsession, his academics greatly suffered. Ryan's grades in high school plummeted as his participation in academics was minimal. Sadly, Ryan also missed the typical highlights of high school such as socializing, homecoming dances, and school events. Often, thoughts of self-loathing and not being loved entered Ryan's mind. Ryan was able to find some solace in his older sister, Melissa, who to Ryan seemed like the only "adult" in the home. Ryan and Melissa remain close today. Ryan was left alone in his room and mesmerized by his computer. Any friendships that Ryan had were initiated and maintained

---

mutism may have a variety of co-existing disorders, such as obsessive compulsive disorder, <u>autism spectrum disorder</u>, or developmental delays.

online. At the age of 16, federal law enforcement initiated its investigation into

Ryan's online activities.  Real in-person relationships or friendships did not exist

for Ryan. Ryan struggled through high school and graduated from Quartz High

School by way of its alternative continuation program with a 1.8 grade point

average.  Ryan moved on to the local community college and enrolled in a couple

of classes. His efforts at community college were unsuccessful.

## Ryan Hernandez and His Personal Struggles Today

Ryan continues living at home today with his parents. He remains

incapable of independent living. His challenges with toilet training, fecal

smearing, general hygiene, and communication make long term dependency on

his family a certainty for the foreseeable future. Following an extensive

psychological evaluation by Dr. Albert Knapp (Exhibit A), Ryan was determined

to be constrained by Autism Spectrum Disorder (ASD).[7] Dr. Knapp relates how

Ryan's challenges have impacted his daily living…

> Although Ryan demonstrates symptoms of selective mutism,
> Ryan's behaviors are better understood as a symptom of ASD
> rather than a separate disorder. Selective Mutism is considered
> an anxiety disorder and Ryan reports minimal levels of anxiety.

---

[7] According to the Centers for Disease Control (CDC), Autism Spectrum Disorder (ASD) is a developmental disability that can cause significant social, communication and behavioral challenges. There is often nothing about how people with ASD look that sets them apart from other people, but people with ASD may communicate, interact, behave, and learn in ways that are different from most other people. The learning, thinking, and problem-solving abilities of people with ASD can range from gifted to severely challenged. Some people with ASD need a lot of help in their daily lives; others need less.

> Rather, Ryan is able to speak with his parents and his friends when
> it is in regards to a need or a specific interest area. This speaks more
> to his communication and social difficulties along with rigidities of
> interpersonal interaction and activities.

Ryan's inability to communicate has been a struggle most of his life. As documented by Dr. Knapp's report, Ryan has never verbally communicated with people close to the family including friends of the family, Ryan's personal doctors, and the family lawyer (Exhibit A, Pg. 4, ¶ 5).  Ryan uses a variety of facial gestures, hand signs, and writing to communicate.

Ryan's long term dependence on technology has undoubtedly contributed to the underlying conduct. Also noted in Dr. Knapp's evaluation are references to "cyber addiction" and an appropriate treatment path.

> Ryan may also benefit from a cyber addiction recovery group
> or treatment program. Although this is not currently a diagnosis
> in the DSM-V, there is emerging support for treatment in this
> area. Ryan's behaviors demonstrate a need for Ryan to develop
> impulse control around cyber-related behaviors.

Since Ryan's initial evaluation in August of 2019, he has voluntarily participated in individual psychotherapy sessions with staff at Albert Knapp and Associates.[8] The weekly individual sessions have been targeting a variety of different areas and include: coping mechanisms for stress and loneliness, impulse control management, development of social skills, and emotional development

---

[8] See Exhibit E.

and empathy.

Ryan and his family are hopeful that he can continue on his weekly therapy regimen moving forward as it has provided support and headway for his challenges.

**Overview of Gaming Addiction**

Since his middle school years, Ryan has been consumed by video games. Playing games on his computer or other devices, such as gaming consoles or mobile phones, account for the majority of his hours spent throughout the day. Sadly, this is the primary manner in which Ryan communicates with people. Through interactive gaming and web applications, Ryan has developed "friendships" and peer groups on-line.  Ryan has no other friends or relationships. Ryan does not leave his bedroom on his own volition. He does not exercise or spend time outdoors. Ryan's only interest is on-line gaming.

"Addiction is any behavior that you have difficulty controlling and that you continue to do despite negative consequences."[9] Video game addiction is also known as gaming disorder or internet gaming disorder and is generally defined as problematic, compulsive use of video and/or internet games, that results in significant impairment in an individual's function.

---

[9] I Want to Change My Life: How to Overcome Anxiety, Depression, & Addiction, Steven Melemis, Ph.d., MD, 2011.

This, and associated concepts, have been the subject of considerable research, debate, and discussion amongst experts in several disciplines and have generated controversy from the medical, scientific and gaming communities. The disorder may present itself as compulsive gaming, social isolation, mood swings, diminished imagination, and hyper focus on in-game achievements to the exclusion of other events in life.[10]

Such disorders can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests and without regard of the negative consequences.[11]

Children with autism spectrum disorder (ASD) and those with ADHD are at risk for preoccupation with video games. Studies have shown that children with ASD spend substantial amounts of time playing video games,[12] [13] [14]  have

---

[10] Schivinski, Bruno; Brzozowska-Woś, Magdalena; Buchanan, Erin M.; Griffiths, Mark D.; Pontes, Halley M. (December 2018). "Psychometric assessment of the Internet Gaming Disorder diagnostic criteria: An Item Response Theory study". Addictive Behaviors Reports. 176-184.

[11] Ibid.

[12] Orsmond GI, Kuo H-Y. The daily lives of adolescents with an autism spectrum disorder: discretionary time use and activity partners. Autism. 2011;15(5):579–599

[13] Mazurek MO, Shattuck PT, Wagner M, Cooper BP. Prevalence and correlates of screenbased media use among youths with autism spectrum disorders. J Autism Dev Disord. 2012;42(8):1757–1767

[14] Shane HC, Albert PD. Electronic screen media for persons with autism spectrum disorders: results of a survey. J Autism Dev Disord. 2008;38(8):1499–1508

difficulty disengaging from them,[15] and show higher levels of problematic

(addictive) video game use than do children with typical development.[16]

While the American Psychiatric Association does not recognize video

game addiction as a disorder, in light of existing evidence, the organization

included video game addiction as a "condition requiring further study" in the

DSM-V as Internet gaming disorder.

**Autism and the Criminal Justice System**

General factors that may make an autistic individual vulnerable to

offending include "poor school achievement, truancy, aggressive behavior," and

factors directly linked to autistic characteristics such as "poor social

understanding or circumscribed interests; difficulties in adjusting to the

diagnosis; and the impact of social exclusion."[17] In recognizing this, the

Asperger/Autusim Network, an Autism advocacy group, sponsored a position

paper[18] outlining principles for prosecutors and court systems to consider. A

sampling includes:

---

[15]  Mazurek MO, Wenstrup C. Television, video game and social media use among children with ASD and typically developing siblings. J Autism Dev Disord. 2013;43(6): 1258–1271

[16] Nally B, Houlton B, Ralph S. Researches in brief: The management of television and video by parents of children with autism. Autism. 2000;4(3):331–337

[17] David Allen et al., Offending Behaviour in Adults with Asperger Syndrome, 38 J. AUTISM & DEVELOPMENTAL DISORDERS 748, 748 (2008)

[18] https://www.aane.org/principles-for-prosecutors/

- Young persons with Autism/Asperger's Syndrome (AS), despite average or higher intelligence and academic performance, have the social and emotional skills of children well below their own chronological age, and well below the minimum age for criminal prosecution in federal and state courts. AS individuals are neurologically impaired in their ability to appreciate the social/moral/legal unacceptability of their conduct or to intuit why the conduct is unacceptable; these are capabilities which state legislators and Congress presumed to inhere in the general population to whom the criminal laws apply.

- In an interrogation setting the AS individuals may appear deceptive because of deficits in communication skills, such as the inability to make normal eye contact. At the same time they may in fact be over compliant with suggestions made by police officers. AS impairs the ability of offenders to respond with expressions of remorse to which prosecutors and judges typically look for reassurance in considering alternate dispositions of criminal matters.

- AS is not a condition related to any sexual paraphilia (e.g. pedophilia) and is not a precursor thereto. Usually little more than giving explicit instructions is needed to prevent recurrence of the behavior. As persons with AS age, they may become better adapted and may present different behaviors than in their youth.

- Prosecutors should take AS into account in determining whether to target, prosecute or seek a conviction in an apparent case of possession of child pornography.

- Persons with AS experience lifelong difficulties. Young persons with AS are not able to live independently, and need to live with their families – their parents and siblings. Therefore the sex offender registration and residency restrictions arising from a child pornography conviction would have a cumulative and disastrous effect in these cases, and on other parties, than in other cases involving neuro-typical adults.

- Prosecutors should be encouraged to defer criminal prosecution in cases involving young first offenders with AS who have no history of directly offending against children, or having produced or distributed child pornography, no clinical indications of pedophilia (other than accessing child pornography) , nor history of prior offenses involving child pornography.

- Prosecutors should encourage therapeutic intervention in cases of suspected child pornography use by such individuals, and utilize probationary periods and deferred prosecutions to monitor compliance before considering actual prosecutions in such cases.

Additionally, professionals in the field indicate that autistic youth may be more vulnerable to exposure to child pornography, because of their disorder. According to Nicole Sussman, M.D., of Cambridge Health Alliance…

> Teens with autism spectrum disorder might be particularly at higher risk for accessing child pornography and subsequent conviction…Meanwhile, autistic youth might feel more comfortable interacting with others on their computers. Paired with a difficulty in judging others' age and a limited awareness or understanding of the potential outcomes of their actions, autistic youth can easily fall into a trap of accessing child pornography. Further, youth are drawn toward images depicting people they personally identify with in terms of their social or emotional age.[19]

Dr. Sussman recommends that preventing Autistic teens from seeking child pornography requires a comprehensive treatment plan that includes digital citizenship education and boundary training.

**Ryan Hernandez is Vulnerable to Victimization or Abuse in Prison**

Notwithstanding the underlying matter, Ryan has never been to jail or prison. Ryan struggles in social settings due to continued awkwardness, selective mutism, and being introverted. Ryan's world is very small, and focused on the inner circle of his family. His world does not include interaction with hardened criminals in a closed prison setting. Ryan's disability and awkwardness coupled

---

[19] Clinical Psychiatry News-*Autistic youth face higher risks from online child pornography* Publish date: December 4, 2018; https://www.mdedge.com/psychiatry/article/190210/mixed-topics/autistic-youth-face-higher-risks-online-child-pornography/page/0/1

with a conviction for child pornography make him prone to attack in prison. Autistic people and people with intellectual disability often have difficulty understanding prison rules and norms, making them especially vulnerable to exploitation in prison.[20] A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure. ‖*United States v. Parish*, 308 F.3d 1025,1031(9th Cir. 2002)(citing *Koon v.United States*, 518 U.S. 81,116 S.Ct.2035)(1996).[21]

In its ground breaking 2001 report on male rape in prison, Human Rights Watch revealed a broad range of factors that correlate with increased vulnerability to rape. Specifically, prisoners fitting *any part* of the following description are more likely to be targeted: young, small in size, physically weak, white, gay, first offender, possessing "feminine" characteristics such as long hair or a high voice; being unassertive, unaggressive, shy, intellectual, not street-smart, or "passive", or having been convicted of a sexual offense against a minor. Inmates with any one of these characteristics typically face an increased risk of sexual abuse, while prisoners with several overlapping characteristics are much more likely than other prisoners to be targeted for abuse.

[20] https://www.themarshallproject.org/2020/11/02/prison-is-even-worse-when-you-have-a-disability-like-autism?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20201102-2217

[21] In Parish, the district court found that the defendant ―was susceptible to abuse in prison because of a ―combination‖ of factors: ―his stature, his demeanor, his naiveté, [and] the nature of the offense.‖ 308 F.3d at 1031-1032

Ryan Hernandez is youthful, unassertive, awkward, timid, and a first-time offender who has been convicted of Possession of Child Pornography. Ryan will be among the most vulnerable to abuse simply because of his appearance and demeanor, coupled with the nature of the crime, possession of child pornography and Ryan's susceptibility for abuse becomes a virtual certainty.

## IV.
## FACTS OF THE CASE AND PROCEDURAL BACKGROUND

Mr. Ryan Hernandez, is a 21-year-old male and citizen of the United States. He has been charged in the Western District of Washington, by Superseding Felony Information, with a single count of *Computer Fraud and Abuse,* a violation of 18 U.S.C. §1030(a)(2)(C)and (c)(2)(B)(iii); and a single count of *Possession of Child Pornography,* a violation of 18 U.S.C. §2252A (a)(4)(b) and (b)(2).

Beginning in at least 2016,  and continuing through June of 2019, Mr. Hernandez hacked into protected computers of Nintendo and stole non-public and proprietary data belonging to Nintendo and shared the data with others through social media and online portals. In late, 2017, the Federal Bureau of Investigation (FBI) contacted Mr. Hernandez and his parents. Mr. Hernandez agreed to cease his conduct. Mr. Hernandez continued his conduct and executed additional intrusions of Nintendo servers. Case agents eventually returned with search

warrants. In addition to evidence of continued hacking, agents located sexually explicit images of minors determined to be illegal.

On January 30, 2020, Mr. Hernandez entered a guilty plea to both charged counts. Sentencing in this matter is set for December 1, 2020.

**V.**

**THE SENTENCING GUIDELINES IN THIS CASE LACK THE SUPPORT OF EMPIRICAL EVIDENCE**

The reasonableness of any sentence is determined by a district court's individualized application of the statutory sentencing factors. Unfortunately, in this case the Court is working with a guideline that is fundamentally different from most in that, unless applied with great care, can lead to an unreasonably excessive sentence that is inconsistent with §3553.

Sentencing guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices, *United Sates v. Rita,* 551 U.S. 338, 349 (2007). However, the Commission was prevented from using the empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under §2G2.1 and 2.2 several times since their introduction in 1987, recommending increasingly

harsher penalties each time.[22]

The child pornography guidelines have been the subject of intense scrutiny leading to a criticism of their application by district courts.  Judges across the country have been critical of the guidelines in child pornography cases, especially the fact that the increase in the guidelines are based on congressional directives as opposed to empirical evidence.[23]

## VI.
## THE STATUTORY SENTENCING FACTORS IN 18 U.S.C. U.S.C.§3553(a) REQUIRE A SENTENCE BELOW THE GUIDELINES RANGE

Core principles in sentencing have now been resolved by the Supreme Court in *United States v. Booker,* 125 S. Ct. 738*, (2005), Gall v. United States*, 128 S.Ct.586, 591(2007) and *Kimbrough v.United States*,128 S.Ct.at 570 (2007)*.*

**The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable**.
*-Nelson v. United States, 129 S.Ct. 890,891 (2009).*

What the Supreme Court has described as the "overarching provision" of 18 U.S.C. § 3553(a) is set forth in that provision's very first sentence – that "the court shall impose a sentence sufficient, but not greater than necessary, to comply

---

[22] United States Sentencing Commission, *The History of Child Pornography Guidelines* Oct. 2009, available athttp://www.ussc.gov/general.20091030_History_Child_Pornography _Guidelines.pdf.

[23] See also *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress")

with the purposes of sentencing set forth in subparagraph (2) of this subsection."
*Kimbrough v. United States*, 128 S. Ct. at 570 (2007). This description by the
Supreme Court makes clear that this "parsimony principle" is not mere precatory
language, but is a key – in fact, *the* key – requirement that a sentence must
satisfy. Thus, factors justifying a sentence outside the guideline range *are no
longer required to be "extraordinary." Gall, 168 S.Ct. at 595*.

> Congress could not have been clearer in directing that no
> limitation be placed on the information concerning the
> background, character, and conduct of a defendant that a
> district court may receive and consider for the purpose of
> imposing an appropriate sentence. Permitting sentencing
> courts to consider the widest possible breadth of information
> about a defendant "ensures that the punishment will suit
> not merely the offense but the individual defendant."
> *-Pepper, 131 S.Ct at 1240*.

Thus, the challenge in this case is to determine a fair sentence that is
sufficient, but not greater than necessary. A sentence that is too severe is unjust,
and therefore, also fails to promote respect for and confidence in the law. As it
pertains to Mr. Hernandez, the sentence which is sufficient, but not greater than
necessary, is far less than the guideline range of 63 to 78 months the
probation office has calculated. Regardless, Mr. Hernandez has agreed to
participate in the plea agreement process in an effort to illustrate complete
acceptance of responsibility and to initiate forward movement and needed

support to Mr. Hernandez' life. Application of the 3553(a) factors clearly

support a mitigated sentence.

Other statutory sections also give the district court direction in sentencing.

Under 18 U.S.C. § 3582, the imposition of a term of imprisonment is subject to

the following limitation: in determining whether and to what extent imprisonment

is appropriate based on the Section 3553(a) factors, the judge is required to

"*recognize that imprisonment is not an appropriate means of promoting*

*correction and rehabilitation"*.

**A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE**
**(*18 U.S.C.§ 3553(a)(1)*)**

The child pornography offense related to Ryan Hernandez is a fairly

typical one; though it involves the use of a computer and possession of a

moderate number of images, some of which may involve prepubescent minors

and are treated as sadistic under the case law, that is true of the vast majority of

child pornography offenses in this computer age. And while such possession of

child pornography is certainly a serious offense, it is serious not so much for the

direct conduct of possession but for the market it creates for those who actually

willfully distribute images, produce the child pornography, and abuse children in

the process. The possession offense falls at the lowest end of the continuum of

sex offenses. It is less serious than distribution of child pornography. It is less

serious than production of child pornography and it is less serious than the actual molestation of children, none of which Mr. Hernandez has been charged with. As the court articulated it in *United States v. Baird, 580 F. Supp. 2d 889 (D.Neb. 2008):*

> It is clear that one possessing child pornography has far less culpability that one distributing pornography, who, in turn, has far less culpability than one who produces child pornography. The greater culpability of an actual predator or abuser should be reflected in a sentence that greatly exceeds the punishment for the exploitative crimes that do not involve acts of abuse by a defendant.

The Third Circuit has offered an important caution when considering child pornography offense conduct:

> It has often been stated that possession and distribution of child pornography are very serious crimes that have a terrible impact on real victims. No one could sincerely disagree with that statement, and the seriousness of the crimes is reflected in the penalties that Congress has prescribed as well as in the Guidelines that are promulgated by the Sentencing Commission. However, revulsion over these crimes cannot blind us as jurists to the individual circumstances of the offenders who commit them.
> *United States v. Olhovsky, 562 F.3d 530, 552 (3rd Cir. 2009)*

**B. THE PURPOSES OF SENTENCING** *(18 U.S.C. § 3553(a)(2))*
**The Seriousness of the Offense and Promoting Respect for the Law, and Just Punishment *(18 U.S.C. § 3553(a)(2)(A)).***

Promoting respect for the law means more than merely doling out harsh punishment. As noted by the Supreme Court in *Gall v. United States, 128 S. Ct at 599*, an overly harsh sentence "may work to promote not respect, but derision of the law if the law is viewed as merely a means to dispense harsh punishment

without taking into account the real conduct and circumstances involved in

sentencing."  And as explained by the Third Circuit with respect to child

pornography sentences in particular:

> The hideous nature of an offender's conduct must not drive us to forget that it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment. Although there are clearly times when anything less than severe punishment undermines respect for the law, it is just as certain that unduly severe punishment can negatively affect the public's attitude toward the law and toward the criminal justice system. It is no doubt partly for that reason that jurists have referred to the responsibility of sentencing as "daunting." The power and responsibility of a sentencing court is, indeed, nothing short of "daunting." It requires a careful balancing of societal and individual needs, and an ability to determine a sentence based on dispassionate analysis of those often competing concerns.
>
> *United States v. Olhovsky*, 562 F.3d 530, 551-52 (3rd Cir. 2009)

These child pornography cases, however have become especially difficult

at sentencing as judges must determine punishment by striking a balance between

punitive measures appropriate for those defendants who produce the disgusting

images, or distribute them for profit, and those defendants, like Mr. Hernandez,

who have no previous criminal history and has not distributed or manufactured

child pornography.

## **Just Punishment** *(18 U.S.C. § 3553(a)(2)(A))*

The child pornography and sexual exploitation guidelines that Mr.

Hernandez is subject to, are unique to the extent that they have been so grossly

increased in just recent years. As a result of the Protect Act, which was passed by

Congress, the Guidelines added a greater base offense level; created mandatory minimums, and an enhancement for using a computer amongst others.  The impact on Mr. Hernandez's potential sentence is significant. The inclusion of an enhancement using a computer and the number of images enhancement are the most glaring examples of where the guidelines do not correlate with present day technology. With no empirical evidence to support how these increased guidelines support the purpose of sentencing, it suggests, at the very least, that political forces, rather than analytical analysis, have entered the fray as to what constitutes "just punishment".

Mr. Hernandez' tragic personal history is a considering factor and similar to that in other cases where the District Courts have considered departures or variances to be warranted. See *United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C.Cir. 1991)(Where Defendant received 51 months in cocaine case, case remanded for district court to consider departure because defendant was exposed to domestic violence; the death of his mother by his stepfather murdering her, his need to leave town because of threats, and his growing up in slums); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001)(where Defendant sent threat to the president, court could downward depart because of combination of brutal beatings by defendant's father, the introduction of drugs and alcohol by his mother, and sexual abuse); *United States v. Rivera*, 192 F.3d 81, 84 (2nd Cir.

1999)("It seems beyond question that abuse suffered during childhood - at some level of severity - can impair a person's mental and emotional conditions…. district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense.").

While Mr. Hernandez did not suffer childhood abuse, he was raised in a chaotic and turbulent environment which led to loneliness, self-loathing, and lack of self-confidence. Additionally, because of his disability and demeanor he has lived a life in which teasing and bullying was the norm within any peer settings that he was a part of. Without effective guidance, supervision, or boundaries, Mr. Hernandez was left to his own devices which led him to obsessive compulsive behavior and to the dark corners of the internet.

### Mr. Hernandez' mental health and the risks of COVID-19 in custody will make incarceration at BOP extraordinarily difficult

The World Health Organization ("WHO") has recognized that incarcerated people "are likely to be more vulnerable to the COVID-19 outbreak than the general population because of the confined conditions in which they live .[24] . The Center for Disease Control (CDC) has explained that correctional facilities

---

[24] Preparedness, prevention and control of COVID-19 in prisons and other places of detention (Mar. 15, 2020),http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

"present unique challenges for control of COVID 19 transmission among incarcerated persons, detention center staff, and visitors." Appx. 416-41 (CDC Guidance). Conditions in correctional facilities pose very significant risks for transmitting COVID-19 not only to the people incarcerated there, but also to employees and volunteers—and from them to the community as a whole.

Regardless whether the Bureau of Prisons ("BOP") can monitor and treat Mr. Hernandez' medical issues and disability, they should be considered along with the deadly and ongoing crisis of COVID-19 in prisons. To determine just punishment for Mr. Hernandez, the Court must consider how he would serve his prison time. To start, he would spend it in lockdown conditions similar to solitary confinement. BOP has "modified its operations" to respond to the spread of COVID-19.[25] Individuals in "every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus."[26] Family and friends cannot visit.[27] And while BOP's website claims movement exceptions are made to

---

[25] Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar.13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II).

[26] Institution lockdown commenced on April 1, 2020 (Phase V). *See also* Fed.Bureau of Prisons, *BOP Implementing Modified Operations*,https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 9, 2020). And, atsome facilities, once someone tests positive for the virus, they are put in solitary confinement. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450(C.D. Cal. May 16, 2020), ECF No. 1.

[27] Fed. Bureau of Prisons, *BOP Implementing Modified Operations* https://www.bop.gov/coronavirus/covid19_status.jsp

permit showers three times a week, telephone and email access, commissary, and laundry,[28] even these most essential activities are not always allowed, and instead, conditions amount to "total lockdown" for "almost twenty-four hours a day."[29] A prison sentence now is essentially a mandate to isolation, though nobody knows for how long.

Despite the BOP's efforts, COVID-19 continues to spread within its facilities—123 people have died, including 121 inmates and two staff members.[30] A report in the Journal of the American Medical Association confirms that "COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population." The case rate in prisons is 5.5 higher than the US population, and the death rate is 3.0 times as high. And "although some facilities did engage in efforts to control outbreaks, the findings suggest that overall, COVID-19 in US prisons is unlikely to be contained without implementation of more effective infection control."[31]

---

[28] Ibid

[29] Fed. Bureau of Prisons, *BOP: COVID-19 Update*,https://www.bop.gov/coronavirus/

[30] Brendan Saloner, Kalind Parish, Julie Ward, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of American Medical Ass'n., July 8, 2020 (*available at* https://jamanetwork.com/journals/jama/article-abstract/2768249.)

[31] Ibid

While Mr. Hernandez recognizes the severity and serious nature of the offenses for which he stands guilty today, he remains contrite and asks the Court to meet the sentencing goals associated with "just punishment", and impose a mitigated sentence.

## Deterrence *(18 U.S.C. § 3553(a)(2)(B))*

In consideration of deterrence – general deterrence, i.e., deterrence of others, and specific deterrence, i.e., deterrence of Mr. Hernandez, at least some courts have questioned whether child pornography sentences can accomplish general deterrence. As the court in *United States v. Beiermann*, 599 F.Supp. 2d 1087 (N.D. Iowa 2009) opined:

> While the public's outcry for harsher sentences in child pornography cases is certainly understandable, there is not a single sliver of evidence in this sentencing record remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet. From the rapid growth of these cases that my colleagues around the country and I are seeing, we cannot sentence Internet users and sharers of child pornography fast enough for long enough to make a dent in the availability of such material on the Internet. This does not mean that the defendant should not receive a lengthy sentence for his criminal conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.

It is also must be noted that scientific studies regarding deterrence suggest that it is the *fact* of a sentence, not its length, that has a deterrent impact.[32] This

---

[32] Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623,653 (2005)

would seem particularly true in the case of child pornography offenders, like Mr. Hernandez, who is a very youthful first time offender, with autism who has never been to prison before, and who feel punished not just by incarceration but also by the social embarrassment, the ongoing label resulting from having to register as a sex offender, and the continuing intrusion into their lives created by the supervised release which follows any term of imprisonment.

## The Need to Protect Society *(18 U.S.C. § 3553(a)(2)(B))*

Relevant factors in protecting society that the sentencing guidelines related to child pornography offenses, *did not take into consideration when promulgated are:*

- Lifetime Supervised Release is now available, as of 2004

- Stringent and behavior related supervised release conditions and strict supervision policies such as sex offender treatment, search, polygraph, surveillance and increased contacts in the community are now all standardized by the Administrative Office of the United States Courts for federal probation officers, as of 2011

- Sexual Offender Registration and Notification Act (SORNA) as of 2006, requiring the registration of all sexual offenders

- Sexually Dangerous Person Designation, as of 2006, thus exposing repeat offenders to potential civil commitment

## The Most Effective Sentence *(18 U.S.C. § 3553(a)(2)(D)*

The sentence imposed must also "provide the defendant with needed educational or vocational training, medical, ***mental health care***, or other

correctional treatment in the most effective manner."

## VII.
## CONCLUSION

To be sure, Mr. Hernandez's misconduct warrants punishment. The punishment, though, must equally account for each factor under 18 U.S.C. §3553(a) without being unnecessarily harsh. Ryan now stands deeply remorseful, extremely regretful,  and he accepted responsibility very early on in the proceedings to demonstrate the extent of his remorse and wanting to take responsibility.

Mr. Hernandez has endured a difficult childhood of loneliness, self loathing and exposure to relentless bullying.  Out of this darkness and self-pity, Ryan turned to the fringes of the internet in an effort to ease his personal pain. This is where he found friendship, attention, and became obsessed with video gaming. Unfortunately, he also found negative peers, a network of criminal hackers and child pornography. To be clear though, Mr. Hernandez is not a prowling pedophile, sophisticated hoarder of images, or distributor of child pornography for whom the stiff guidelines were intended. Ryan is an immature, first time offender, who is developmentally disabled and challenged in many ways by Autism Spectrum Disorder, which surely contributed to his poor decision making process. To his credit, Mr. Hernandez has been attending weekly

psychotherapy sessions to assist in the management of his disorder.

Further Mr. Hernandez, at age 21, must register as a sex offender in any community where he lives and works. In California, Mr. Hernandez will live with the stigma of his conviction for a lifetime; a stigma that will dictate where he can live, work, or recreate. Thus, a sentence below the advisory Guidelines should not be interpreted as leniency.

Ryan Hernandez has many personal challenges at the moment, but nevertheless he is ready to accept responsibility for his actions and move forward with his life. The Court is asked to impose a sentence, consistent with the plea agreement, that reflects moderation, compassion, and recognition of the immensely difficult and painful situation in which Ryan, through his mistakes, has placed himself and his loved ones.

A mitigated sentence, with an appropriate period of supervised release which is also a "substantial restriction of freedom," *Gall v. United States*, (2007)[33] – is more than sufficient to constitute just and fair punishment.

//

//

---

[33] This is especially true in the case of a child pornography offender, because the conditions imposed on such offenders are usually significantly more intrusive and demanding. In May of 2011, the Administrative Office of United States Courts issued national policy to federal probation officers outlining appropriate procedures in the community supervision of child pornography offenders. In addition, child pornography offenders must register as sex offenders and carry that public brand.

Respectfully submitted on this 25th day of November, 2020.


 __/s/ *Sara L. Caplan*__
Sara L. Caplan
Attorney for the Defendant
CA. State Bar Number: 147271



 __/s/ *Christopher R. Black*__
Christopher R. Black
Attorney for the Defendant
WA. State Bar Number: 31744

# VIII.
# LIST OF EXHIBITS

A. PSYCHOLOGICAL EVALUATION OF RYAN HERNANDEZ BY KNAPP & ASSOCIATES

B. PSYCHOLOGICAL EVALUATION OF RYAN HERNANDEZ AND RELATED DOCUMENTS TO NORTH LOS ANGELES COUNTY REGIONAL CENTER

C. BUREAU OF PRISONS MEMORANDUM

D. CHARACTER REFERENCE LETTERS

E. LETTER FROM RYAN'S THERAPIST

CURRICULUM VITAE OF SENTENCING CONSULTANT ROGER PIMENTEL